ELIZA G. BLAZIER, APPELLANT, V. EMMA E. ALLOWAY ET AL., APPELLEES.

FILED JULY 3, 1930. No. 27324.

*Clarence T. Spier* and *John W. Yeager,* for appellant.

*Moher & Carrigan, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON, EBERLY and DAY, JJ.

DEAN, J.

Eliza G. Blazier, plaintiff, is·a widow past 81 years of age. She began this suit in the district court for Washington county wherein her daughter, Emma E. Alloway, and her daughter's husband, O. S. Alloway, are named as defendants. The object and prayer of plaintiff's petition are to rescind, cancel, and annul a certain deed executed by herself, on or about December 15, 1926, wherein it is provided that plaintiff's daughter Emma shall receive a ten-eighteenths interest in and to the following described tracts or parcels of land, owned by plaintiff, and located in Washington county, namely, the southwest quarter of the southwest quarter of section 4, and the southeast quarter of the southeast quarter of section 5, township 17, range 11, and also lot 18, block 2, in the village of Kennard. The court found for the defendants, and the plaintiff has appealed.

The plaintiff alleges that she was wrongfully induced to execute the deed by the fraudulent, unlawful, and improper designs of her daughter and her daughter's husband, and that they exercised undue influence upon her while she was their guest and a visitor in their home in Enid, Oklahoma. Plaintiff's permanent home is in Kennard, Nebraska, and she has resided there for ten years last past. Plaintiff testified that it was her intention to convey only an eight-eighteenths interest in the land to her daughter Emma, but that the defendants fraudulently connived together and caused a ten-eighteenths interest in the land to be inserted and described in the conveyance. The defendants, however, allege that the plaintiff directed that two-eighteenths of the ten-eighteenths interest should be conveyed by defendants to each of two granddaughters of plaintiff, namely, Gwen-

dolyn Shafer and Gladys Watt (nee McCann), that is to say one-eighteenth interest to each granddaughter.

At the time of the execution of the above named Alloway deed, plaintiff also executed another deed wherein she conveyed an eight-eighteenths interest in the same land to Mrs. Ella I. Fair, another daughter. But Mrs. Fair is not a party to this suit. Both of the above mentioned deeds contain this provision in behalf of Mrs. Blazier, namely: "I reserve to myself the use and full control of the above described real estate and the revenue therefrom during my lifetime."

Plaintiff testified: "Q. All of that time you had intended to give Mrs. Alloway eight-eighteenths of it; is that correct? A. No; I wasn't counting on any eight-eighteenths. I was counting on when I was dead and gone that the property was to be divided among, between my heirs and my grand-daughters and there was nothing said about it to anybody. I never said to a living soul what I intended to do. * * * Q. You understand, Mrs. Blazier, do you, that in these deeds that you executed, you retained a life estate in this real estate? Do you understand what I mean, Mrs. Blazier? A. Why I was to have the use of my property as long as I lived. Q. And you understand that in these deeds that was reserved to you, do you? A. Yes. Q. How? A. I wouldn't have signed the deeds any other way. * * * They both was each of them to have eight-eighteenths, my daughters."

Plaintiff also testified that, as soon as the deeds were signed, Mr. Alloway took possession of them and locked them up in his desk. The plaintiff denied that she had the deeds in her bedroom for a week immediately after they were signed, as certain of the proofs tend to prove. And from plaintiff's evidence it appears that Mrs. Fair knew nothing about the drawing up of the deeds until a long time after the event. Plaintiff testified that she read Mrs. Fair's deed but not the Alloway deed at the time they were executed. It appears that plaintiff remained at the Alloway home for three months after the execution of the deeds but she made no complaint to any member of the family about

the deeds. She testified that she is perfectly satisfied with Mrs. Fair's deed, which is not involved in this suit, but that she wants the Alloway deed canceled in its entirety.

O. S. Alloway testified that he had a conversation with plaintiff on the train on a certain trip to Enid, Oklahoma, and that plaintiff said that "her desire was that she dispose of it (her property) in some manner by deed, not wishing to leave any estate. In fact it had been talked over off and on a long time before when she was down there. Nothing definite was ever done at that time. * * * And her first proposition to us was that she would deed the entire property to my wife to be distributed in any way she saw fit. * * * We objected to that in that we didn't want to be responsible for any part of someone else's interest. * * * The sum and substance of it was that it was finally disposed of just as the deeds are written with the understanding that my wife receive the two-eighteenths for those grandchildren and pay that one-eighteenth out of the proceeds after the property was sold. Q. After the death of Mrs. Blazier? A. Yes; after the death of Mrs. Blazier. She held a life estate in the use of the property."

Alloway also testified that the deeds were handed to plaintiff when they were executed and that she retained them in her own possession until they were filed. And it appears that the plaintiff told Alloway how relieved she was that "everything was out of the way." On the Sunday following the execution of the deeds, Alloway and his family, consisting of six daughters and a son-in-law, were present when plaintiff went into her bedroom and returned with the deeds and passed them around for inspection. From his evidence it appears, too, that plaintiff told him she did not tell Mrs. Fair about the deeds because she said "she didn't think it was any of her business and she didn't want her to know anything about it." Alloway denied that he ever did anything to induce plaintiff to execute the deeds.

Mrs. Alloway testified that her mother read both deeds before she signed them, and that she heard M. J. Frantz, before whom plaintiff acknowledged the deeds, ask her if she understood that one deed was for eight-eighteenths and

the other deed was for ten-eighteenths, to which plaintiff replied that she did; and when the deeds were executed the plaintiff took them into her own room and kept them there. It also appears from the evidence of Mrs. Alloway that plaintiff told her several times that "she was so relieved that that was done and she felt she had done better than to have a will," and that, some time later, plaintiff said she was still satisfied with the disposition of her property, and she said "she wouldn't do it any differently today if she had it back again."

M. J. Frantz, the notary public above mentioned, testified that he prepared the deeds under the direction of O. S. Alloway; that the evening of the same day he called at the Alloway home to take plaintiff's acknowledgment, and that he read one of the deeds in full to her and explained that both deeds were alike except as to the grantee's name and the interest conveyed. The notary also testified that plaintiff said she was signing the deeds of her own free will and that it was her voluntary act, and that she examined both deeds in his presence and, from her talk and demeanor, "she seemed to be perfectly satisfied with them," and that he heard no more of the deeds until almost two years thereafter when the present suit was begun.

A lady who witnessed the signing of the deeds, and who resided next door to the Alloways, testified that plaintiff at the time expressed herself, in the presence of the witness, as being "so glad her business was settled, and she couldn't thank me enough. She is very expressive. She said she wanted to thank me—she was so glad to get everything done right, and that was the end of it." The evidence of four daughters and also a son-in-law of the defendants Alloway is to substantially the same effect.

On rebuttal, the plaintiff denied that she ever at any time read the Alloway deed, and testified that she never heard a word that was spoken between Mr. Alloway and the notary, and that she never made a statement to defendants about not being able to trust her daughter, Mrs. Fair, as some of the defendants testified. She also denied that the deeds had been passed around on the Sunday after they

were executed, or that she ever at any time talked with any of the Alloway girls in respect of the deeds, or that she ever told them she was relieved that the deeds were signed.

In the plaintiff's petition and in her brief, the statement appears that she is "aged, infirm, and easily susceptible to influence on the part of her daughter, Emma E. Alloway, and her husband, O. S. Alloway." But no evidence whatever was introduced that tends to prove an allegation of plaintiff's susceptibility nor of the influence of the defendants upon her acts. We have held:

"Where it is sought to cancel a deed for the want of mental capacity of the grantor to make the instrument, the burden of proof is on the one who alleges the mental incapacity." *Brugman v. Brugman*, 93 Neb. 408; *In re Guardianship of Wessel*, 114 Neb. 704; *Hansen v. Roos*, 115 Neb. 761.

The evidence does not show that plaintiff was induced by either Alloway or his wife, or by any other person, to execute the conveyances. The deeds were signed in the presence of a witness and regularly acknowledged by the plaintiff before competent authority. And, besides, there is a reservation, above noted, in both of the conveyances for "the use and full control" by the plaintiff of all of the "real estate and the revenue therefrom" that is involved in this suit, during her lifetime. And it appears to us that the execution of the deeds conserves the safety of the title to the body of the estate in the name of the plaintiff. It is a recognized fact that an aged person of plaintiff's advanced years might, either by chance, or by wicked design, come in contact with some unregenerate person by whom she might be deprived of the title to her estate in its entirety. But the plaintiff has lost nothing in that the entire annual proceeds of the land is secured to her for her sole use and enjoyment so long as she shall live.

In *Nichols v. Emery*, 109 Cal. 323, the court held that, where the owner of real property during his lifetime conveyed such property to a son, as trustee, to sell within ten months after the death of the grantor, reserving the right to revoke such trust, but continued in possession of the land

during the remainder of his life without revoking it, such a conveyance immediately passed a vested interest to the trustee.

"The conveyance of a present interest operates, of course, unless there is a specific reservation of a power of revocation, to cut off all the grantor's rights in the interest conveyed. Having disposed of it by a present conveyance, he cannot retake it; and the conveyance is irrevocable. Hence, it is said that an instrument containing a clause postponing its taking effect until after the maker's death, which passes an interest that is irrevocable, is a deed." 11 A. L. R. 38.

In an action to annul a deed for alleged fraud and coercion in obtaining the deed, reliance cannot ordinarily be placed on the pleadings alone. In the adjudicated cases it clearly appears that such deed will not be set aside where the evidence fails to disclose that the execution was the result of undue influence exercised upon the grantor, but discloses that such conveyance was her voluntary act and that she fully understood the transaction.

The court saw and heard the witnesses and observed their demeanor while they were on the witness-stand. In such case the law is well settled in this jurisdiction that, while this fact, of itself, is not conclusive upon the parties, it is nevertheless of much weight in the premises. The judgment is consistent with the pleadings and is abundantly sustained by the evidence.

Reversible error has not been shown. The judgment is therefore in all things

AFFIRMED.